Okay, the next case is number 16-1795. Intellectual Ventures I and Intellectual Ventures II against Motorola Mobility. Mr. Nielsen. Thank you, Your Honor. May it please the Court. What I'd like to do is start with the written description issue, if I may. So the history and how this raised, it starts with Mark down at the claim construction issues at the court below. There was an argument made by Motorola that said you can't have storage of the message on intermediate devices during the transfer. No matter how transient? Correct. And the other side's position was transient storage is permissible. You're going to explain why this is wrong because I think this is what the district court concluded. The range of the wasn't on the table. Nobody suggested that the claim allowed long-term storage of any sort and your written description argument depends on the disparity between a long-term storage claim construction and the absence of written description support. And I think the district court said that was never on the table as a claim construction. Okay, so part of that's right and part of that's wrong. And let me explain the part of that that's incorrect. At Markman, that wasn't the issue. At Markman, what was presented was no storage. That was Motorola's position. You can't have storage during transfer. IV's position was storage is allowed, right? No limitation on that. In other words, those two requirements, there were two requirements that were stated in the patent about the keys to the invention being I don't have any intermediate storage and I don't require user login. The court, and I believe this is appendix of 378 is my recollection in the Markman, said those were two distinct things and there was no reason why you had to claim both of those things in any particular claim. Therefore, I'm not reading a storage limitation in. Where the transient, non-transient came in, Your Honor, was in the written description because Motorola then, the way Judge Robinson does her proceedings is the summary judgment motions are alternative. The argument was made if you don't have the storage limitation in there that Motorola sought during claim construction, then you violate the written description. The argument made by IV was no, no, we have written description for no storage limitation because we described using the internet as an intermediary device and our expert through a declaration says that there is transient storage, so to speak, that goes on temporary storage in there. So that was the claim construction issue. Now, given that claim construction at trial, is what the court said at written description, I'm not going to decide summary judgment of written description because I believe there's a factual issue as to whether there's disclosure of this transient storage through the use of the internet. So then at trial, the decision was made by  At that point in the summary judgment, did you say, for purposes of this argument, we'll stipulate to transient storage being disclosed still wouldn't be enough because the claim construction actually allows any period of storage? No, that wasn't, at the summary judgment, that position was not taken. Doesn't that confirm that this question of long-term storage is allowed? You would have had to say transient storage doesn't support long-term storage. No, that was raised at trial. So there's no requirement that you have to raise every issue in summary judgment in order to preserve that. In fact, I don't need to file a summary judgment motion on anything. The reason why that dichotomy was set up was because of the claim construction position was taken at summary judgment and Judge Robinson's procedures that she would consider summary judgment in connection with the claim construction. So the position was taken then, there is a storage limitation. Storage on intermediate devices is precluded. And then the alternative position in the written description summary judgment motion at the time was if you don't have that, in other words, if that limitation is not part of Claim 41, in this case, then it's invalid for written description. But there's no question but that there is a written description that would support temporary storage as part of the transfer, right? Actually, we would disagree with that, but we don't need to take that position. That's fine. But what's precluded, it seems to me, is long-term storage that continues after the transfer takes place. And that quite apart from whether the issue was raised that Judge Robinson was quite correct that the claims here don't include long-term storage that's not part of the transfer. No, the written description issue is that the claims allow long-term storage as part of the transfer process. So in other words... I don't understand what that means. As I understand it, what happens here in the transfer is if the device isn't turned on, there might be temporary storage until it is turned on and the transfer can be completed, and there's a delay in the transfer as a result of the device not being turned on. And that, as you say, that's part of the Internet. That's what happens. But that doesn't present a written description issue. What presents a written description issue is there's some storage that continues after the claims address that or cover that. So when you say that device, are you talking about the accused devices or talking about the device that's described in the patent? The device that's described by the claims. It doesn't seem to me that a reasonable interpretation is that that would include long-term storage that continues after the transfer is complete. Well, there's no limitation on storage at all. There are in claims 10, 26... But the specification says that the storage, that long-term storage that's associated with email is undesirable. We don't want to do that, so why wouldn't one just construe the claim not to reach that? Well, but that wasn't IV's position. IV's position was any type of storage is allowed. They didn't take the position in response to claim construction that said, we want a negative limitation on the claim. Their argument and the district court's conclusion, which is the appendix of 378, that's the Markman opinion, is there's no limitation in storage at all, Your Honor. And so the device, just to address your question directly, you wouldn't have a situation in the device that's described in the specification as well as claimed in the patent where the device, the receiving device, is off when the message is sent. Because at column 13, for example, of the patent... But the transient storage, my understanding is that they had evidence, is part of what the internet does, is transient storage that occurs when the receiving device is on. That would occur when the receiving device is on, correct? Correct. I mean, that was their response at trial to your claim that the written description doesn't support it. It says the written description refers to internet transmission. The internet, even for devices that are on, temporarily stores things, routers or somewhere, along the way. And so it has to allow that. That was the response to the written description in the judgment motion. That's correct, Your Honor. At trial too, right? That issue went to trial. At trial, that really wasn't the issue. So in other words, there wasn't... That was what was taken off the table. The court said that there's a factual dispute on this, whether the internet presents transient storage during transfer. So rather than argue that factual dispute, the decision was made, well, let's just focus on the long-term storage piece, which there was no argument that that was allowed by the claim. In other words, long-term storage during transfer. Everybody agreed. The Markman opinion said there's no limitation on storage during transfer at all. Their expert agreed repeatedly that yes, long-term storage during transfer is allowed by Claim 41. But what is during... See, that's the problem. Hey, during transfer as opposed to storage that is occurring after transfer is completed. Well, the fact of the matter is the second one was never... We could never have raised that because that wasn't the claim construction. There was no limitation on storage at all. That's true in these devices and that would have been a non-infringement argument had that point been raised. But the extension specification is saying long-term storage is bad. It's talking about long-term storage after the transfer is completed that would occur, for example, in email. Well, no. Long-term storage, it isn't just after. There's no distinction that's being made, right? Because you could have an email system and there are plenty of those that when it's popped, in other words, it's downloaded, that's the end of the message. It doesn't retain a copy. But you do have, for security issues, the fact is it exists there. It exists in some interim devices that are outside the control of the receiving party and that creates a security risk. That's what the patent says. There is no distinction made in the patent between long-term storage after transfer versus long-term storage during transfer. And, Your Honor, you'll never have the second long-term storage during transfer, not just the disparagement issue that's there, but in terms of the way the invention is described. So in column 13 of the patent, at line 60, it says in the present invention, so in the present invention, broad language, to send a file from one interconnected PC to another, each PC must be able to detect communication responses from other PCs. So, in other words, there's already a ping that's made before a message is ever sent, and it goes out in detail and explains embodiments of what those things are. I don't want to truncate this too much, but I do, and I don't know whether Judge Toronto has more questions on this, but I did want to get to direct infringement before we run out of time. Sure, absolutely. In reading the specification and the claims, it seems to me that where it's talking about an authentication message, it's talking about the authentication message being received by the sender. I think it's rather explicit about that. Isn't that a requirement of the claim, that the authentication message be received by the sender, as opposed to being stored by the carrier somewhere? Yeah, that's correct. The authentication message would be received by the sender, as well as then a delivery report. Can you show me where in the claim it says that, and whether that's part of what you had them instructed on? Right, right. So, let me... It's in column 19, right, of the patent, for example. On 19, line 4, the receipt file is returned from the recipient to the sender directly, or through a third-party authenticator. Isn't that suggesting that this receipt message is sent back to the sender? Well, that is. There's no question that that's the idea. In Claim 41, I'm not sure that there is that explicit requirement in Claim 41. Right, I didn't need to understand that was a dispute. No, that is. So, let me frame what the dispute is. So, what Claim 41 requires in regard to... There's two things. There's the delivery confirmation message, as well as... That goes to the third-party authenticator. Correct. That would be from the recipient of the message sent to the third-party authenticator. Then the third-party authenticator generates a delivery report. And this obviously goes to the obviousness argument as to the importance of that, and having a third-party authenticator so that there's no dispute between parties in the instance of when there's a lack of trust, so to speak. In terms of the direct infringement issue, there was absolutely no evidence. So, let's just focus on the delivery report, because under the Centillion case, what's required... Let me just ask you this, because it connects about three sentences ago with the current point. Why does the user, the sender, the customer, not benefit from the anti-fraudulent claim benefit that you just mentioned that the third-party authenticator provides? I'm not talking about the delivery confirmation message. There's two separate requirements. There's also the report, as well. And it's the report that we focused on, which would be generated by the authenticator. What was accused was in what's called the MMSCs, which means something in the networks of the service providers, somebody like Verizon, for example. There was a point pointed to a log that was generated. There was no evidence whatsoever that that was sent to the recipient, or excuse me, the sender of the message. Why doesn't each user, as you described a moment ago, benefit from the existence of such a report that, if needed, can be obtained? Well, there's no evidence of that. That's exactly the problem. I thought it couldn't be obtained. As far as the record is in this case, it can't be obtained by the sender. The recipient's either party. For three of the carriers. For three of the carriers, absolutely, 100%. There was no evidence put in at the trial in terms of the record that says, here, the sender could get this if they needed it, and this would be the benefit associated with that. Or the recipient, I guess. So as part of your obviousness case, you had a witness say, one reason for the motivation to combine, or rather to get the third-party authenticator in the process, was that it provides a benefit, I assume, to users of the system, that there is this third-party out there who can call out one of the parties who claims falsely that the message was never gotten. To a degree. Wasn't that what your witness said? In terms of the motivation to combine the two references, that's right. But you said that it was a benefit to do this, to have the third-party authenticator. Why is that not a benefit that under your reading of Centillion is a benefit to the user of the system? Two different benefits that we're talking about. So the benefit in terms of the motivation to combine was that in the reference that was direct, where the sender would send the delivery confirmation message to the... I have the parties backwards. The recipient would send the delivery confirmation to the sender, and then there would be a delivery report that would be generated. The reference itself, which the primary reference is, the over-end reference said that the part of the reason why you do that is because parties may not trust, so generate contemporaneous records of that. The Macaulay reference further recognizes having a third party in there. It transmits the messages as well, but to handle the reports such that there is further trust. In other words, no dispute that you can't jimmy the system, so to speak, to generate a false confirmation message or vice versa. So when a user, a sender of this system, one of the two kinds of direct infringers alleged, sends a picture and text, why does that user not benefit from that feature of the system? And when you say that feature, you're talking about the delivery... The third party authenticators receiving information that has been received and generating a report. Okay, so it's that last piece, the generating a report. So was that not part of your obviousness case? You didn't say that there was a motivation to generate a report, by a third party? No, there absolutely is. That is part of the obviousness case. I thought that the obviousness testimony was that there was a benefit to the sender in being able to secure verification that it was sent, but that with respect to three, with respect to direct infringement, with respect to three of the carriers, that opportunity does not exist. That the sender cannot secure that benefit of being able to secure a confirmation. Is that correct? That is correct. That is correct. And that's the distinction that I'm trying to draw. So with respect to the motivation to combine, the question was, would there be a motivation of somebody that already recognizes a problem when there are these... There was no dispute that there was a delivery confirmation message from recipient to sender, as well as the delivery report generated in the primary reference. It's just that these details matter. Did you make a carrier-specific non-infringement JMOL argument? I don't remember seeing it in your brief. With respect to the direct infringement? Yes. No. Yeah. So as long as there is some carrier that makes this anti-fraud report available, your JMOL argument has to be rejected on that ground, on that point. Well, I agree with respect to that particular issue. If that were the argument, it would be a damages issue. I understand that, Your Honor. Right. And which we haven't raised yet. But that isn't the argument. Here, there was no evidence that was made, right? No evidence that was made that that delivery report, which is a requirement of the claim, has any benefit to the sender at all. Your own obviousness evidence? No, it doesn't at all. Because the obviousness evidence was only the motivation to substitute in the position of the sender generating the messages in the report, the third party authenticator. So there was no dispute as to whether there would be a motivation to generate a delivery report whatsoever. OK. Well, last point. We're going to save you a rebuttal time. Is there anything else you need to tell us at the moment? No, I'll save it for later. Thank you, Your Honor. OK. Thank you, Mr. Nelson. Mr. Bilodeau. May it please the court. I think it's important with the written description argument to- Let's stick with the direct infringement thing, since we were discussing that just now. If I understand correctly, you don't dispute that with respect to three of the carriers that it had no capability of sending this report back to the sender, right? Right. But you still benefit from the overall use of the system. And it's there just because it doesn't send it back, which the claim doesn't require. OK, I understand the position, but they can't get it with three of them. With respect to the other one, is it agreed that there's no evidence the report was sent back? There would be- The capability is certainly there. Was there evidence that the carriers were actually doing this? No, but the capability is there. But it doesn't matter to the claim, because the claim only requires that the authentication device generate the delivery report. It doesn't require it to go back. And you still benefit from that being there, because you can call the carrier, or you can look at your bill and see what messages you send. As to one carrier? As to U.S. Cellular? Well, really as to any carrier, because it's going to be recorded at the authentication device. I thought the record was pretty clear that as to the three, you couldn't get the message. That it wouldn't be sent back. But that doesn't mean that you couldn't get it through alternative means. It doesn't mean that it's not there for you to call the carrier, or get it on your bill. I think the point with direct infringement is that you benefit from each of the limitations, even though Centillion doesn't require that you literally benefit on an element-by-element basis. I don't think that that's a- This does seem awfully important. So was there evidence as to three of the carriers that there was no way for the sender, for example, to get the information about whether the message had been received? It's not that there was no way to get that information, because by definition of it being retained at the MMSC, there is a way to get it. It's that it wasn't actually sent back to them. That would be- As part of the system, you couldn't get the information. You'd have to go outside the system to get the information. Is that fair? That would be fair. But again, the claim, what the claim requires, is only that that authentication device generate that delivery report. The claim does not require that it be sent back- that the delivery report be sent back to the sender. It doesn't require that at all. Yeah, but I think this discussion is assuming that it doesn't require that it be sent back. The question is whether under Centillion, there's a benefit to the sender if it's not sent back. Right, but under Centillion, you have to benefit from the invention as a whole. It's not a benefit to each- Assume that the better reading of Centillion is that you have to benefit from each feature, including here the creation of a record in the third-party authenticator. Just assume this. A record by the third-party authenticator that the message was received. You're benefiting from it regardless of whether you see it, because there's a record of it. Would you really benefit from it if you never could get it? You don't have to know that you benefit. Yes, because if you never could get it, because it could go on your bill. It's used for anti-fraud, as you said, it could be used for anti-fraud. The fact that you don't get the delivery report, which again is not a requirement of the claim, there's no knowledge piece to Centillion. You don't have to know that you're benefiting. And to hold that would be grafting on almost a scienter or knowledge requirement to 271A. And 271A is a strict liability offense. So if you are using it, and if you're benefiting from the system as a whole, if you're using a system that meets all the elements, you are deriving that benefit whether you know it or not. You agree that they don't know it, that the users here don't know it? I don't agree that they know or don't know, because most of them presumably are receiving a bill that would have all of those records. In other words, the record doesn't show that they knew. Right. The record is agnostic as to whether they know or not. But there is no knowledge requirement for use. You don't have to... All you have to do is put it into service, even in... But the problem is, how do you benefit from it if you don't know that the feature exists? Well, I'll give you an example, Your Honor. I mean, there could be a thousand inventions in a cell phone that you don't know exist, but you're benefiting from all the time. Phones get faster. You don't know how it's getting faster. You don't know the inner workings of it. But nevertheless, you're benefiting from the feature. You don't know what's going on at the base station. It's a situation in which somebody is doing something for you that benefits you. So the question here is, in terms of the ability of the user to secure verification, the user doesn't know about the ability to secure verification. So it's a little bit difficult to see how that's a benefit to the user. Now, in terms of anti-fraud, that's something which arguably benefits the user, even though the user doesn't know about it. But it seems to me that if the claim benefit is being able to get the report and the user doesn't know about the ability to get the report, it's a little difficult to see how the user is benefiting. Well, there's the anti-fraud scenario, as you said. But say you had encryption. The user has no idea what encryption is going on, but they're still benefiting from that encryption. Here, you're benefiting from the authentication device. You're benefiting from someone making sure that message was delivered. And you are benefiting on that basis alone. There's a device out there that's confirming this for you. You benefit by having someone confirm something for you. If you had a banker confirming all your transactions for you, that's a benefit to you, whether you know the bank is confirming them for you or not. Someone is confirming delivery of these messages for these users, and that's a benefit that they're receiving, whether they get that report or whether they know about it. Can I ask a term to another piece of the infringement, the contributory infringement? Why is picture-only MMS transmission not a substantial non-infringing use? So based on the jury instruction, which was the MMS hardware and software, was what was pointed to as the piece that we were pointing to. If you don't have a text with the picture, you don't have multimedia. And not having multimedia can't be the same as having multimedia. Well, here's my confusion about that. It seems to me that what you just said, and which I think is the argument you made in your brief, is a way of saying, well, this can't be a substantial non-infringing use because it's not infringing. It's not just that it's not infringing. It's almost like it's the opposite. Does it use this same system? The picture-only transmission, does it use the MMS functionality? Well, no. You accused functionality. No, because it's not an MMS. It's just a picture-only. That's not a multimedia message. I guess I'm truly seeing that as like 180 degrees backwards. And so you're going to need to explain. It seems to me it's one thing to say it's not infringing. It's another thing to say, forget about what the patent claims. What does the accused device do? The accused functionality, does it, when I send a picture without any text, am I using the MMS functionality? The accused MMS functionality. We would say no, because an MMS is not being sent. Because it's not multimedia. It's one form of media. Is the software different? I mean, is there some, what are you suggesting here? There's separate software for sending pictures, and pictures plus text? Well, the software, well, there is separate, truly separate software for the text-only. The text-only. The SMS, completely different. Right, that's why it's a picture-only. The MMS, you're not using, and if you look at the jury instruction again, because this was a jury instruction that was agreed upon and was not objected to, it had to be the hardware and the software for the MMS functionality, the full extent of that. And what's missing is, when you don't have the text, it's A, not multimedia, and you're not having this combining, this single combined file that has to get encapsulated to be sent. Because there's the limitations about a single combined file. But that doesn't seem to me to answer the question. The question is whether there is the same software that's used for sending a picture as sending a picture plus text. I would say it's in the same, it's within the same application, is what it is. Well, that sounds like a substantial non-infringing use. I mean, again, for the reasons set forth in that briefing, I would say it's not. And you haven't argued or pointed to evidence that basically it's an oddball thing to send a picture without text. Everybody puts text. So it may be non-infringing, but it's not substantial. I don't remember seeing that point being made. That point was not made in the briefing. And what about on the inducement side of things? Isn't there a difference between, I'm not going to get the numbers right, two of the manuals and the other manuals? Well, yes. But there's evidence that cuts across all models. First of all, all the models work the same. That was the evidence adduced to trial. So you're putting out the same functionality. I would submit you can't have intent as to some phones and not other phones when they have the same functionality. Putting that aside, we also have advertisements and what was called ModoCare, which is on their website, which highlights this feature and tells you how to use it across models. What's this feature? The MMS feature, the MMS functionality. So there's what we have... Plus text? Pictures plus text? Pictures plus text. Yes, MMS. So you have it in multiple manuals. You have it in advertisements and you have it in ModoCare. There's also literally no counter evidence on intent. It was struck. There was no witness. No one got up from Motorola and said, we didn't have intent for this to infringe because A, B, or C. There was none of that. And the only argument they say Motorola advances on appeal is that, well, oh, Centillion would negate our intent. But who was the trier effect? The trier effect's the jury. The jury never heard anything about Centillion. So Centillion's not a basis to negate intent. They have nothing that negates intent on their side of the scale. And then on our side of the scale, we have manuals. We have all the products work the same. We have ModoCare. We have advertisements. But ModoCare is a website. Part of the Motorola website explaining this. Correct. Without distinguishing among the several different models that are accused. Precisely, your honor. And you have the fact that they never changed their behavior afterwards. So when you stack all these things on our side and the dearth of evidence for them, there's more than substantial evidence to infer intent for inducement. And again, saying that only two manuals having it when you have evidence that cuts across, that can't negate intent for evidence that cuts across all models. And you can't have intent as to some models when you have the same feature across all models. You don't have individualized intent for each product. You can't, especially when there's no evidence to the contrary. Is the jury actually supposed to receive evidence about cases and legal interpretations to determine the reasonableness of the legal interpretation? Right. But it's not, there needs to be, well, I would say yes, because the jury is the one determining the intent. I'm sure we've decided that. Okay. But regardless, it would have had, even if the jury didn't care, it has to come from someone at Motorola. Motorola is not saying we have no intent because. That can't be articulated through the mouth of an attorney. Because it needs to come from a witness. It needs to come from Motorola. And that's what Judge Robinson recognized when she struck this good faith belief defense. Because there was no witness. There was no one there at Motorola to say we have this belief. It's just, it's almost like hearsay. The attorney's saying Motorola's intent is negated. And again, this is a litigation defense after the fact. And just by, the law is not such. So your view is it has to be subjective intent. Objective reasonableness isn't enough. Well, I don't think they've even shown the objective reasonableness, because there's, again, there's no. Why should they be entitled to argue to the jury that it was objectively reasonable? She prohibited them from doing, right? She didn't, well, she didn't prohibit them from arguing anything to the jury if they would have had a witness or someone to put forward this. And also, the Centillion piece, what was struck was a good faith belief based on invalidity. There was never good faith belief based on Centillion until in the post-trial briefing. That was not the evidence that was struck. So they said, we want to put on evidence of a good faith belief based on invalidity. No witness, that was struck. And then the Centillion is now what they think their basis is for a good faith belief raised in the Rule 50 papers. Can I just double check one thing that may seem trivial? You do not request an injunction in this case, is that right? Have we not requested an injunction? The injunction was not pled in the complaint. Okay. I asked that for jurisdictional reasons, our jurisdiction. Yep. And then I will reserve any time unless anyone has any questions about specifically whatever written description. Thank you. So on the direct infringement piece, this goes back to the Centillion issue. There isn't any evidence in the record for any of this. So the only evidence in the record is as to three of the carriers, you cannot, the user can't request the delivery report. It can't be used for anything. Where's that? Can you show me that? In the, yeah, that is in our brief. You have that here. The appendix at 639. 639. Right. And that's the trial record 399, 11 to 13. And then it's page 49 and 50 of our brief, your honor. The other citation as to US. I'm sorry, 639 where? It's page 399, 11 to 13. What is this testimony from their expert witness? Yes, I believe that's right. Yeah, the cross of the, so it's the testimony, but the cross examination testimony. And then you'll see, I should let you look at that before I move to the next one. I'm sorry. So what are you pointing me to say that carriers other than US Cellular do not make reports in any way available? Correct. No, where is that? The lines you just showed me, I'm understanding to say something about US Cellular. Right. That's in the answer. So there's no evidence with respect to anybody. So it's page 399. It's appendix 639. It's 399 of the trial record. And the answer is as to US Cellular is the only one that even saw evidence of the generation of a delivery report. So did you, I mean, that sounds like a, an argument for non-infringement, not, not no benefit, just non-infringement as to all of the calls that go over all carriers, the carriers other than US Cellular. I don't see you making that argument. Well, no, no, we're talking about the benefit piece. So that- You just said something about three of the, you said this evidence, and I can't read it this fast, says that three of the carriers don't even generate a report. How in the world is that not a non-infringement argument? Well, if I, if I said that don't generate the report, don't make the report available is what I meant. So if I said that I misspoke, Your Honor, I apologize. It's not available to the sender. That's correct. And that's what this testimony is. So the evidence was only that it's even available as to one. And there was no evidence whatsoever provided that that was ever done, that it was ever used for any purpose. You heard a bunch of speculation by IV's counsel saying, well, that could be used for billing. Again, there's no, excuse me, no evidence that it's actually used for billing at all. That's just speculation. What about inducement? Inducement as to the manuals? So- Well, the whole question of inducement is to, as to whether J-MOL should have been granted on inducement. Right. So as to 12 of the 14, what they primarily relied on was the manuals, right? And show the manuals instructing, they say, the use of MMS. As to 12 of the 14, it's undisputed that there is no discussion of sending text in a picture, which is what's required under their infringement theory in the case. What about this website thing that they, that Mr- Yeah, the website thing was, well, in their brief, the only thing that what they cite for benefit is a discussion by their expert of the patent itself. So they don't cite the- On inducement. Correct. And they cite that for evidence of inducement. Why is that not enough? That plus actual testimony that these all work and were designed to work the same way. Well, for two reasons. One, there isn't anything that it's talking about those with respect to particular phones, right? Well, but if the website says, this applies regardless of the phone. It's just talking about functionality generally. It's not talking about the functionality in particular phone, nor is there any discussion. Remember, another requirement in the phones is that they be set under their infringement theory for automatic receipt. And there's no pointing to it, whether it be in the manuals themselves or in this website, that the user set these up for automatic receipt of these messages. So you're lacking that functionality as well. And so that what we have here is a broad... Well, I've pointed to two of the manuals and in the two of the manuals, I can point to picture and text being an example that's shown. I can't point to any functionality that says set this, do this with automatic delivery of the message. And then there's a website statement that isn't particular to any of the phones where there's just a generic statement about sending MMS messages. And there's no discussion in there about setting these phones up for automatic delivery. Why you would want to do that, what the benefits are of doing that. So there's a gaping hole in the... And this is their burden to show this. I know there was a lot of talk about Motorola not having a witness to come up and rebut this, but it's their burden to show the intent required for inducement. It's not Motorola's burden to show a lack of intent. Now there was, Your Honor, in addition, one other question about... And I believe this goes to both the contrib and the inducement point about whether a picture-only message would use MMS. And that is the case. I think they conceded that. I think they conceded that. Okay. It's the appendix at 634 and that testimony continues to 635. So it is the case. And there was no dispute that that would be a substantial amount of infringing use. I think you saw that here. Rather, the argument was that can't be because it doesn't infringe, which I don't quite understand that logic. But that was the argument that was made. So without that, I won't go back to address the written description unless Your Honor has any question there. Or we didn't address the obviousness. I don't know if there are questions specific. I'd be happy to address those, but I don't want to belabor that if Your Honors are not... I see no more questions. No more questions, Mr. Mills. Okay. We'll take the case under submission. Thank you both for the argument. Thank you very much. The Honorable Court is adjourned until tomorrow morning at 10 a.m.